FILED

12/27/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0372

DA 21-0372

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 249

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

BRYCE CALEB HAMERNICK,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
                  In and For the County of Missoula, Cause No. DC-2019-353
                  Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

           Chad Wright, Appellate Defender, Alexander H. Pyle, Assistant Appellate Defender, Helena, Montana

      For Appellee:

           Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant Attorney General, Helena, Montana

           Kirsten H. Pabst, Missoula County Attorney, Ryan Mickelson, Deputy County Attorney, Missoula, Montana

                              Submitted on Briefs:  August 23, 2023

                                     Decided:  December 27, 2023

Filed:

                        _____
                                  Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Bryce Caleb Hamernick appeals his conviction of Sexual Intercourse Without Consent (SIWOC) after a jury trial in the Fourth Judicial District Court. The jury was instructed that, to reach a guilty verdict, it needed to find Hamernick was aware of the high probability the victim did not consent to sexual intercourse. Hamernick argues the instruction improperly lowered the State's burden of proof by relieving it from proving that he knew his sexual conduct was without consent. We thus consider the following issue:

> *Did the District Court err by instructing the jury that, to reach a guilty verdict, it needed to find Hamernick was merely aware of the high probability the victim did not consent to sexual intercourse?*

¶2 We reverse and remand for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

¶3 S.[1] was seventeen years old when she began working as a cashier at a Missoula restaurant. Hamernick also worked at the restaurant and eventually took a management position in which, when their shifts overlapped, he supervised S. At trial, S. testified that she initially found Hamernick to be "friendly." Her opinion changed, however, when Hamernick began texting her about his sexual fantasies centered around her. S. texted Hamernick that she found his behavior, as her boss, to be inappropriate, and did not want him "hitting on [her]." Hamernick's behavior could be cyclical: he would engage in the

---

[1] S. was eighteen years old at the time of the offense. While M. R. App. P. 10(6) does not require anonymity, both Hamernick's and the State's briefs omit S.'s full name and initials because her identity has not been publicized. Hamernick uses "S" and the State uses "Jane Doe," and we utilize "S." herein.

2

deleterious behavior, apologize to S. for not being able to "control [him]self," profess he would stop, but return to his ways soon thereafter. Hamernick maintained that, although S. rebuffed his inappropriate text messages, she reacted positively to his advances in person.

¶4 At trial, Hamernick testified he started "feeling more than just friendship" toward S. in the winter of 2017. Further, despite S.'s repeated rejections, Hamernick explained he continued to pursue S. because he "absolutely" desired a relationship with her. Some of the restaurant employees expressed ambivalence towards the "light flirting" they described between Hamernick and S., while others expressed discomfort regarding what they viewed as Hamernick's inappropriate interactions with S. while at work.

¶5 In the summer after her high school graduation, after she had turned eighteen years of age, S. broke up with her boyfriend of almost two years. Hamernick testified that, following the breakup, he and S. engaged in several consensual "physical interactions," including "necking." Hamernick relayed that S. would initially consent to these interactions, but always "flip[ped] a switch" and would tell him "stop" or "no" or even push him away, ending the interaction. Despite her protestations that ended each interaction, Hamernick maintained that "[w]ithout a doubt, [S.] was into it" up to that point. Hamernick's behavioral cycle continued after these physical interactions. After being rebuffed during one such contact, Hamernick apologized to S. via text, stating he had "misread [her] reactions." In a June 17, 2018 text, Hamernick proclaimed he would "stop forcing [him]self onto [her]" because she had "made [it] very clear" she did not want a romantic relationship with him, but he nonetheless returned to his pursuit of S. While

3

Hamernick testified S. would say "stop" or some variation of "I don't want to do this" every time he touched her, he continued to assert that each interaction began with S.'s consent. Under cross-examination, Hamernick insisted that "every time she told [him] no, [he] stopped right away."

¶6 On July 7, 2018, both Hamernick and S. worked the closing shift at the restaurant. After closing, around 10:30 p.m., S. accompanied Hamernick to the restaurant's storage building across the street, where Hamernick would enter supply orders. S. sat in a chair while Hamernick entered the order. Hamernick and S. provided differing accounts of what happened thereafter.

¶7 In S.'s retelling, after entering the order, Hamernick approached S., knelt in front of her, and then began touching her thigh, breasts, and neck. S. turned her head away to avoid Hamernick's attempts to kiss her. When S. tried to move away, Hamernick forced her hips down into the chair. S. kept telling Hamernick "no" and that she "had to go home." Hamernick asked S. if she was sure, telling her he thought she "wanted it anyways." Hamernick kept telling S. that she was not serious and that she was "joking" when she said "no." Hamernick forced S. to touch his penis with her hand. He removed her clothing, turned her to face away from him, and pushed her down on a table. When S. felt Hamernick's penis between her legs, she tried to push him away using her hand. When S. felt Hamernick penetrate her vagina with his penis, she yelled at him to stop. Hamernick asked her if she "really wanted" him to stop. Throughout the encounter, S. tried to stand up and kept telling Hamernick she had to leave. She recalled that she somewhat "froze"

4

and was not sure what to do.  Eventually, Hamernick stopped.  He apologized to S., telling her he felt as if he "just raped" her.

¶8       Conversely, Hamernick, under examination by his counsel, testified the interaction began with a "quiet moment" before he told S. "I really want to kiss you right now," to which she responded to by "giggl[ing]" and saying, "I bet you won't."  When he went to kiss her lips, she turned away but "put her neck out."  He then asked if she wanted to be kissed, to which she again "giggled."  Hamernick described this portion of the interaction as "kind of a game."  He then kissed her neck and S. "start[ed] to grab [his] arms . . . kind of pull[ed] [him] into her," which Hamernick described as "obviously reciproca[l]."

¶9       Hamernick continued to kiss S.'s neck and began "touching her knee and the inside of her thigh."  Hamernick stated S. then "open[ed] her legs a little bit" so he "beg[an] to rub her vagina through her clothing."  Hamernick "could tell that she was very into it."  While Hamernick reached into S.'s clothing to "touch her vagina around her panties," S. was "saying yes and saying [his] name" and "enjoying herself."  Hamernick testified he "absolutely" could not have been "confused" about what S. wanted at this point because she was reciprocating and "never said stop" and "never pushed [him] away."  When the two relocated for comfort, S. "had a big smile on her face."  After asking for S.'s permission, to which she "said 'uh-huh' and moved her head up and down as a yes," Hamernick "took out [his] penis . . . lead her hand over [it]" and she "proceeded to give [him] a hand job."  According to Hamernick, S. was then "smiling," "giggling," and "look[ed] like she [was] having a good time."

5

¶10     S. then stood up, mentioned that it was late, and "shuffled" around Hamernick to leave.  Hamernick "pulled her into [his] body" and asked in a whisper whether she was sure she did not have more time—to which she responded, "I suppose."  Hamernick then told S. that he wanted to have sex with her.  S. verbally responded with "an affirmative yes."  They then moved to a nearby table and, with S.'s assistance, Hamernick undressed her to her underwear.  Hamernick "began to rub the tip of [his] penis against her vagina" and Hamernick offered that S. was "having a good time, without a doubt."  However, when Hamernick then began to "put [him]self inside her," S. "stiffen[ed] up" and said "no, not that."  Hamernick then returned to his previous action of rubbing his penis in "her clit area," but S. then stated she did not "want any of this anymore," at which point, Hamernick claimed he "immediately back[ed] off."  S. gathered her clothes and began to leave.  Hamernick asked her what had happened, and S. responded she was not sure, but that they "shouldn't have done that" and it "was too far."  S., upon Hamernick's prompting, said he had not done anything wrong, but that she should have "stopped it a lot sooner."  They then parted ways.

¶11     S. testified that, at home, she could not sleep, "felt dirty," and wanted to "erase what had happened."  After talking with her former boyfriend about the incident, S. contacted the police.  In the following days, S. was medically evaluated, and bruising was found consistent with having been pushed down into a chair.  The morning after the incident, police took Hamernick to the station for questioning.  At Hamernick's residence, police found an apology letter in which Hamernick expressed regret to S. over betraying her.  In his initial accounts to police, Hamernick expressed regret and repeatedly explained what

had occurred. He opined that S. may have felt violated because when she stopped his attempt at vaginal sex, he understood her rejection as specific to vaginal sex, and thus he continued his prior action of rubbing his penis against her clitoris. About a year later, the State charged Hamernick with SIWOC.

¶12 Hamernick requested an instruction that defined the mental state of "knowingly" as being "aware that [the] sexual intercourse was without consent." The District Court declined this instruction and gave two instructions offered by the State, that "[a] person acts knowingly with respect to the *element of sexual intercourse* when the person is aware of his conduct" and that "[a] person acts knowingly with respect to *the element of without consent* when the person is aware of a high probability that the sexual intercourse was without consent." (Emphasis added.) Under the latter instruction, the State argued Hamernick was guilty even if his version of the incident was accepted. Hamernick was found guilty, and the District Court sentenced him to a twenty-year prison sentence, with fifteen years suspended, and a five-year parole restriction.

## STANDARD OF REVIEW

¶13 "The standard of review for jury instructions is whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case." *State v. Kirn*, 2023 MT 98, ¶ 16, 412 Mont. 309, 530 P.3d 1 (citing *State v. Dunfee*, 2005 MT 147, ¶ 20, 327 Mont. 335, 114 P.3d 217). Accordingly, "[w]e review a trial court's decision regarding jury instructions for abuse of discretion." *Romo v. Shirley*, 2022 MT 249, ¶ 62, 411 Mont. 111, 522 P.3d 401. "We consider the instructions in their entirety and in connection with other instructions given and evidence introduced at trial." *Romo*, ¶ 62. "If the instructions are

7

erroneous in some aspect, the mistake must prejudicially affect the defendant's substantial rights in order to constitute reversible error." *State v. Deveraux*, 2022 MT 130, ¶ 20, 409 Mont. 177, 512 P.3d 1198 (citing *State v. Gerstner*, 2009 MT 303, ¶ 15, 353 Mont. 86, 219 P.3d 866). Jury instructions that relieve the State of its burden to prove each element of an offense violate a defendant's right to due process. *State v. Miller*, 2008 MT 106, ¶ 11, 342 Mont. 355, 181 P.3d 625.

## DISCUSSION

¶14 *Did the District Court err by instructing the jury that, to reach a guilty verdict, it needed to find Hamernick was merely aware of the high probability the victim did not consent to sexual intercourse?*

¶15 A person commits the offense of sexual intercourse without consent if "[the] person . . . knowingly has sexual intercourse with another person without consent." Section 45-5-503(1), MCA. "Consent" means "words or overt actions indicating a freely given agreement to have sexual intercourse or sexual contact[.]" Section 45-5-501(1)(a), MCA. "[A]n expression of lack of consent through words or conduct means there is no consent or that consent has been withdrawn[.]" Section 45-5-501(1)(a)(i), MCA.

¶16 "When a criminal offense requires that a defendant act 'knowingly,' the [d]istrict [c]ourt must instruct the jury on what the term 'knowingly' means in the context of the particular crime." *State v. Azure*, 2005 MT 328, ¶ 20, 329 Mont. 536, 125 P.3d 1116. "A district court has broad discretion in formulating and approving jury instructions." *State v. Ragner*, 2022 MT 211, ¶ 30, 410 Mont. 361, 521 P.3d 29 (citing *State v. Kaarma*, 2017 MT 24, ¶ 27, 386 Mont. 243, 390 P.3d 609). "[C]ourts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that

8

word to each element." *Deveraux*, ¶ 32 (quoting *Flores-Figueroa v. United States*, 556 U.S. 646, 652, 129 S. Ct. 1886, 1891 (2009)).

¶17    Section 45-2-101(35), MCA, provides three definitions for "knowingly":

> [1)] A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when the person is aware of the person's own conduct or that the circumstance exists.
>
> [2)] A person acts knowingly with respect to the result of conduct described by a statute defining an offense when the person is aware that it is highly probable that the result will be caused by the person's conduct.
>
> [3)] When knowledge of the existence of a particular fact is an element of an offense, knowledge is established if a person is aware of a high probability of its existence.

These statutory definitions are commonly referenced in our opinions by short labels or terms, including, respectively, the "conduct-based" definition, the "result-based" definition, and the "high probability of a fact" definition. *See Deveraux*, ¶¶ 30-32; *State v. Secrease*, 2021 MT 212, ¶¶ 11-12, 405 Mont. 229, 493 P.3d 335; *State v. Hovey*, 2011 MT 3, ¶¶ 20-21, 359 Mont. 100, 248 P.3d 303.

¶18    The District Court segmented the offense into two elements, "has sexual intercourse" and "without consent," and gave different instructions for each element. For "has sexual intercourse," the District Court instructed that Hamernick must be found "aware of his conduct"—the conduct-based definition of knowingly. For "without consent," the District Court instructed that Hamernick must be found "aware of a high probability that the sexual intercourse was without consent"—the high-probability-of-a-fact definition of knowingly. The court instructed further that "[t]he consent of [S.] is a defense to the offense of sexual intercourse without consent." This instruction reflects the

9

2017 amendments to the definition of "consent," which now provides that "consent means words or overt actions indicating a freely given agreement to have sexual intercourse or sexual contact." Section 45-5-501(1)(a), MCA (2017). This legislative revision did not change the language of the element itself, which remains "*without* consent," and did not revise the crime's mental state of "knowingly."[2]

¶19    Hamernick's argument that the District Court's "high probability of a fact" instruction constituted error that prejudiced his defense necessarily requires a brief summary of the above-described details to demonstrate his fact-based defense. According to the testimony Hamernick provided at trial, during the initial physical contact that led to the parties' disrobing and to his attempt to engage in vaginal penetration, S. had been "smiling," "giggling," "pulling [him] closer," and did not verbalize lack of agreement. *See* § 45-5-501(1)(a), MCA ("consent means words or overt actions indicating a freely given agreement"). This included a period after, according to Hamernick, he had received an "affirmative yes" from S. that she would like to have sex, and he rubbed his penis against her clitoris. Hamernick claimed S. was "reciprocating" during this period. It was not until Hamernick began to penetrate S.'s vagina that he claims she "froze" and said, "no, not that." Hamernick contended he understood this response by S. to be specific to vaginal intercourse, and so he returned to his prior action of rubbing his penis against her clitoris, until S. stated she did not "want any of this anymore," at which point, Hamernick said he

---

[2] These amendments to the SIWOC statute were made in Chapter 279, Laws of Montana (2017), entitled in this regard as "An Act . . . Removing the Requirement of Force From the Definition of 'Consent'[]."

"immediately back[ed] off." According to Hamernick, it was his failure to understand S.'s words in response to his attempt at vaginal intercourse that prompted his feelings of guilt when their intimacy abruptly terminated, and which led to his apology letter and initial comments to the police.[3]

¶20    Hamernick does not dispute that he engaged in sexual intercourse with S., but denies he did so with knowledge she was not consenting to the conduct; in other words, he claims he was not aware his conduct was against her will. Noting that this Court has approved the conduct-based definition of knowingly for SIWOC in several cases, and quoting *Deveraux*, Hamernick argues that because "[f]or SIWOC, the prohibited particularized conduct itself—engaging in sexual intercourse with another person *without that person's consent*— gives rise to the entire criminal offense," the conduct-based definition for knowingly should have been given in his case for all of the elements of the crime, not just the "has sexual intercourse" element. *Deveraux*, ¶ 32 (italics in original). Hamernick contends that, under the conduct-based definition of knowingly, the jury would have had a legal basis to acquit him if they chose to believe his account, including his assertion that S. initially consented to their intimate contact. However, he argues that, by departing from the conduct-based definition approved in precedent and giving the high-probability-of-a-fact definition of knowingly, the District Court lowered the State's burden of proof of the mental state from an awareness of S.'s consent to an awareness of only a "high probability"

---

[3] The State argues that admissions from Hamernick during cross-examination served to undermine his version of the incident, but the jury was nonetheless entitled to believe those portions of his detailed account it deemed to be credible.

that, despite any initial indications by S., S. had not consented. Hamernick contends that requiring the jury's consideration of this lower bar permitted the State to argue he was guilty even under his own version of the incident, and violated his right to due process. The State argued that, "based on all of his words and actions," Hamernick should have been aware of the high probability of the fact that S. had not consented to his sexual advances. As Hamernick's briefing explains, "the State's argument would be appealing because it offered the jury a path to resolve the case without having to resolve conflicts between S's and Bryce's accounts—by letting the jury assume the truth of Bryce's account but nonetheless to find him guilty."

¶21 Where an offense criminalizes "particularized conduct," a conduct-based instruction is appropriate. *Deveraux*, ¶¶ 31-32; *see also State v. Lambert*, 280 Mont. 231, 236, 929 P.2d 846, 849 (1996) (considering which "knowingly" definition is proper for the offense of criminal endangerment and holding, "[t]here being *no particularized conduct* which gives rise to criminal endangerment, applying to that offense's mental element the definition of 'knowingly' that an accused need only be aware of his conduct *is incorrect*."). (Emphasis added.) We held in *Deveraux* that SIWOC is a conduct-based offense for which the mental state of "knowingly" is properly defined as when the person is aware of his conduct. *Deveraux*, ¶ 32. Deveraux had argued that because the element of sexual intercourse itself is not criminalized by the statute, he could be convicted merely because "he was aware he was engaging in that legal act with his then-wife," and thus, he was entitled to a "result-based" or "highly probable" instruction. *Deveraux*, ¶ 32. We rejected the argument, explaining that "the prohibited particularized conduct" under the SIWOC

12

statute was not merely awareness of sexual intercourse but "engaging in sexual intercourse with another person *without that person's consent.*" *Deveraux*, ¶ 32. (Emphasis in original.) Then, with the application of "knowingly" to this conduct, this constituted "the entire criminal offense." *Deveraux*, ¶ 32. We further noted that we had repeatedly approved the conduct-based instruction for SIWOC. *Deveraux*, ¶ 33. In *Ragner*, we noted generally that, "[i]f the statute defining an offense prescribes a particular mental state with respect to the offense as a whole without distinguishing among the elements of the offense, the prescribed mental state applies to each element." *Ragner*, ¶ 33 (citing § 45-2-103(4), MCA). There, we affirmed against the defendant's challenge a conduct-based "knowingly" instruction for SIWOC that provided "with respect to the totality of the elements of the crime . . . the person is aware of his or her own conduct." *Ragner*, ¶ 28 (internal quotations omitted). In *Gerstner*, we further explained that the result-based "knowingly" instruction advocated by the Defendant decreased the State's burden of proof: "[h]ad the jury been instructed that, to convict, Gerstner only had to be aware of the high probability that the contact was sexual in nature, the State's burden of proof would have been lessened." *Gerstner*, ¶ 31; *see also Gerstner*, ¶ 29 ("The offense of sexual assault requires that the accused knowingly make sexual contact with another. It is the particularized conduct of making sexual contact that the statute makes criminal.").

¶22 The State argues the "high probability of a fact" definition of knowingly was properly given because attaining another's consent is "threshold event" that is more likened to a "fact" than a "circumstance," although no authority is cited for this proposition. The State offers that *Deveraux*, *Ragner*, and *Gerstner* are distinguishable because, while they

affirmed the use of the conduct-based definition of knowingly, they did not prohibit use of a "high probability of a fact" definition. The State also cites to our approval of the "high probability of a fact" definition in *State v. Hovey*. *See Hovey*, ¶ 21.

¶23 The State is correct that our cases affirming the conduct-based definition for sexual crimes have not prohibited the instruction given here. Indeed, in *Ragner*, we reiterated the general rule that "[a] district court has broad discretion in formulating and approving jury instructions." *Ragner*, ¶ 30. However, the State's argument does not rebut the contention that the prosecution's burden of proof was reduced in this case. *Gerstner*, ¶ 31. The jury's legal basis for acquitting Hamernick, if he was believed factually, was seriously eroded by the prosecution's position, permitted by the instruction, that he was guilty under the law even by his own version of the incident. Despite the language of the statute criminalizing the act of knowingly engaging in sexual intercourse "without consent," the State was relieved of proving that Hamernick knew his sexual conduct with S. was without her consent, instead needing to prove only that he was aware of "a high probability" of such. Nor does the State's argument address the troubling implications of permitting the use of two differing mental state definitions, as essentially interchangeable alternatives, in SIWOC prosecutions, a seemingly unfair double standard. More, if approved here, it would seem the State could prosecute other kinds of cases with the lower-burden "high probability" definition of knowingly.

¶24 *Hovey*, cited by the State, illustrates the distinctive use of the high-probability-of-fact definition of knowingly. There, the defendant was charged with Sexual Abuse of Children, under which he was alleged to have knowingly possessed photographs depicting

14

minor children engaged in sexual conduct. *Hovey*, ¶ 4. The District Court gave a conduct-based knowingly instruction for the element of the defendant's awareness of possessing the photos, but a "high probability of fact" knowingly instruction for the element of defendant's awareness that the models in the photographs were underage. *Hovey*, ¶ 8. We upheld these instructions, reasoning that Sexual Abuse of Children was an "offense of conduct" warranting a conduct-based knowingly instruction, while the "high probability" instruction, which we described as a "fact-oriented instruction," was appropriate for the State's obligation to prove the defendant's awareness that the models in the photographs were underage. *Hovey*, ¶¶ 20-21. The language of the mental state statutes creates the distinction recognized in *Hovey*. The "high probability of a fact" definition is to be used when "knowledge of the existence of *a particular fact* is an element of the offense." Section 45-2-101(35), MCA. (Emphasis added.) By the plain language, this mental state definition is directed to a narrower factual issue than the conduct-based definition of "aware[ness] of the person's own conduct." Section 45-2-101(35), MCA. It would have been difficult or impossible for the State to prove the "particular fact" of the ages of the unknown persons in the photographs possessed by the defendant in *Hovey*. Yet, the existence of the photographic evidence of the models made it possible to assess the *probability* of the defendant's awareness of that particular fact and element—the models' ages. For that reason, the "high probability" definition was properly utilized in *Hovey* to address the fact-specific secondary mental state within the offense—Hovey's claim that he was unaware of the ages of the models.

15

¶25 Here, however, there is no such "particular" fact question presenting a specific secondary factual issue that would not properly fall within the conduct-based definition of knowingly as "awareness of conduct." "Without consent" is a critical and often contested fundamental element of the crime. The mental state of "knowingly" may be proven, and routinely is proven, by inference from the facts. *See State v. Christensen*, 2020 MT 237, ¶ 126, 401 Mont. 247, 472 P.3d 622 ("the jury may infer the requisite mental state from what a defendant says and does, and from all the facts and circumstances involved"); *see also* § 45-2-103(3), MCA ("The existence of a mental state may be inferred from the acts of the accused and the facts and circumstances connected with the offense.").

¶26 The crime of SIWOC is a conduct-based offense, necessitating an "awareness of conduct" mental state instruction. *Deveraux*, ¶¶ 31-32. Under the language of the statute, the crime does not consist of sexual intercourse with a high probability the other person does not consent; rather, it is sexual intercourse with the awareness that it is *without* that person's consent, which may permissibly be inferred from all of the facts and circumstances of the case. *Christensen*, ¶ 126; § 45-2-103(3), MCA. Thus, to determine whether Hamernick is guilty of SIWOC, the question must be whether Hamernick was aware of his conduct—that is, whether he knowingly had sexual intercourse with S. without her consent.[4]

---

[4] Justice Baker's Dissent states that Hamernick's argument "suggests that S. telling Hamernick 'no' and 'stop,' even her trying to get away from him and expressing visible discomfort, would not be enough to find that Hamernick knowingly raped her" and "effectively gives Hamernick a pass to not comprehending the basics of consent." Dissent, ¶ 38. However, that is not and has never been the law, which we are simply reaffirming here. It is important to understand that, under Hamernick's version, these facts did not occur. But if the jury rejects Hamernick's version, and

16

¶27    We conclude that the District Court erred by giving the jury a high-probability-of-a-fact definition of "knowingly" for the element of "without consent," rather than a conduct-based definition, and thus failed to "fully and fairly instruct the jury as to the applicable law." *Kirn*, ¶ 16. We further conclude the error, when considered in conjunction with Hamernick's trial testimony, *Romo*, ¶ 62, "prejudicially affect[ed] the defendant's substantial rights," because it undermined his defense by improperly lowering the State's burden of proof. *Deveraux*, ¶ 20

¶28    Accordingly, we reverse the judgment of conviction and remand this matter for further proceedings.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR

Justice Beth Baker, dissenting.

¶29    I would affirm the judgment because the District Court's jury instructions fully and fairly reflected the law applicable to this case and did not in any event prejudice Hamernick's substantial rights.

---

accepts S.'s version that these facts did occur, then it would be entitled to and could very well infer from such circumstances that Hamernick—or any other defendant in like circumstances—was aware that his conduct was without the victim's consent, and he thus acted knowingly. *See Christensen*, ¶ 126 ("the jury may infer the requisite mental state from what a defendant says and does, and from all the facts and circumstances involved"). The point here is that, under the instructions as given, the jury's ability to find Hamernick not guilty even under his version of the incident was seriously eroded.

¶30 Generally, "[i]f the statute defining an offense prescribes a particular mental state with respect to the offense as a whole without distinguishing among the elements of the offense, the prescribed mental state applies to each element." Section 45-2-103(4), MCA. As the Court recognizes, however, this language does not require a trial court to instruct the same definition of the prescribed mental state for each element of an offense. Depending on the nature of the offense, multiple instructions for "knowingly" may be appropriate. *See Hovey*, ¶ 22. "A district court has broad discretion in formulating and approving jury instructions." *Ragner*, ¶ 30 (citing *State v. Kaarma*, 2017 MT 24, ¶ 27, 386 Mont. 243, 390 P.3d 609).

¶31 In *Hovey*, the defendant argued that the existence-of-fact instruction regarding knowledge that the pictures he downloaded depicted children rather than adults lowered the State's burden of proof because it did not need to convince the jury that the defendant was "aware" that the "erotic models were children," only that he was aware of a "high probability" that the medium depicted children. *Hovey*, ¶¶ 12, 21. We concluded that the court did not abuse its discretion, because the defendant "explicitly argued that he was unaware of the ages of the models"—a specific fact within the offense. *Hovey*, ¶ 21. An instruction addressing the defendant's awareness of a high probability of that specific fact, therefore, fully and fairly instructed the jury on the culpability necessary to convict. *Hovey*, ¶ 21.

¶32 Hamernick did not dispute at trial that he engaged in sexual intercourse with S. His defense was that he acted without knowledge of the element that made it criminal: lack of consent. The District Court instructed the jury, in accordance with § 45-5-501(1)(a), MCA,

18

that consent means "words or overt actions indicating a freely given agreement to have sexual intercourse or sexual contact[.]" "[A]n expression of lack of consent through words or conduct means there is no consent or that consent has been withdrawn[.]" Section 45-5-501(1)(a)(i), MCA. The court gave correct instructions on the elements of the charged offense, including that the State had to prove beyond a reasonable doubt that Hamernick "acted knowingly" when he had sexual intercourse with S. and that the act of sexual intercourse was without her consent. The court instructed further that "[t]he consent of [S.] is a defense to the offense of sexual intercourse without consent." The 2017 statutory amendments reflected in these instructions make clear that, before engaging in the act of sexual intercourse, both parties must affirmatively demonstrate a "freely given agreement" to do so. Section 45-5-501(1)(a), MCA (2017).

¶33 The history of the parties' relationship, even by Hamernick's account, was that S. would receive his advances to a point and then turn him away—in the words of the statute, withdrawing her consent. She would communicate this through "words or conduct," § 45-5-501(1)(a)(i), MCA, either by telling him he was being inappropriate or she did not "want to do this" or by turning away from him or pushing him away. The key fact in contention at trial was whether S. made a similar communication to Hamernick on the night of July 7, 2018, before he put his penis in her vagina. This is not unlike the dispute in *Hovey*, where the defendant argued he was "unaware" that the pictures he possessed depicted children. *Hovey*, ¶ 21. We held that the trial court acted within its discretion when it instructed the knowledge of the victims' ages as an existence of fact: the defendant

19

had to be aware of a high probability that the erotic models were underage. *Hovey*, ¶¶ 20-21.

¶34 Hamernick and S. gave materially different descriptions of their encounter, but he acknowledged S.'s statements that she needed to leave and her vocalized protests to his actions. The District Court had discretion to formulate jury instructions on the varying factual elements within the charged offense that were appropriate to the evidence. *Hovey*, ¶ 22. There was no dispute that, at some point during their encounter, S. withdrew any consent she had given. The evidence required the jury to determine *when*, as a matter of fact, S. communicated to Hamernick through words or overt actions her lack of "a freely given agreement" to engage in intercourse with him. "In determining how to instruct the jury, the district court should take into consideration both the parties' theories and the evidence presented at trial." *Camen v. Glacier Eye Clinic, P.C.*, 2023 MT 174, ¶ 21, 413 Mont. 277, ___ P.3d ___ (internal quotation and citations omitted). Considering the nature of the evidence and Hamernick's defense, the existence-of-fact instruction on lack of consent was not an abuse of discretion. *See Hovey*, ¶ 21.

¶35 The Court agrees with Hamernick that *Deveraux* forbids any set of jury instructions for sexual intercourse without consent other than mental state instructions for both "sexual intercourse" and "without consent" that required the jury to find him aware of his conduct. We did not reach this holding in *Deveraux*. We addressed whether a conduct-based instruction allowed a lower burden than instructing the jury that "knowingly" meant being aware the conduct was highly probable to *cause a specific result*. *Deveraux*, ¶ 30. We rejected that contention, concluding that the offense of sexual intercourse without consent

20

prohibits particularized conduct, not a specific result. *Deveraux*, ¶ 32. Our decision in *Deveraux* spoke to two of the three possible definitions of "knowingly"; it did not address, and certainly did not resolve, the question before us now—the application of the third definition, when a specific fact is at issue in the case.

¶36 The Court also accepts Hamernick's argument that *Ragner* prohibits the jury instructions given in his case. In that case, we rejected the defendant's argument that the jury should have been instructed that knowingly as to "without consent" meant "the person is aware that the circumstance exists." *Ragner*, ¶¶ 28, 34. The court instead gave one instruction "with respect to the totality of the elements of the crime of sexual intercourse without consent, as 'the person is aware of his or her conduct.'" *Ragner*, ¶ 28. We concluded that courts must instruct on the applicable definitions of "knowingly" and that the court did not abuse its discretion when it instructed on the awareness-of-conduct definition for both elements. *Ragner*, ¶¶ 32, 34. If it has any bearing here, *Ragner* illustrates our deference to the court's discretion in formulating jury instructions; we said nothing to mandate a specific instruction on the definition of "knowingly" in all sexual intercourse without consent cases. *Ragner*, ¶¶ 31-32.

¶37 The Court's stated concern that use of the instruction in this case could open the door to "other kinds of cases" and potentially lower the State's burden of proof is speculative and unpersuasive. We have advised trial courts "that jury instructions should be tailored to the facts of the case." *State v. Strain*, 190 Mont. 44, 54, 618 P.2d 331, 337 (1980). A court thus does not abuse its discretion when it instructs on the definitions of the requisite mental state applicable to the case before it. *Ragner*, ¶ 34; *Hovey*, ¶¶ 20-21.

21

In this situation, Hamernick contends the jury needed to be instructed that he was "actually aware" that S. did not consent to sexual intercourse. Hamernick admitted that he recognized S.'s discomfort, that she said no, and that she asked him to stop. Hamernick proposes that the instructions required the jury to convict even if it believed that when he actually became aware that S. did not consent, he stopped.

¶38    Hamernick's argument suggests that S. telling Hamernick "no" and "stop," even her trying to get away from him and expressing visible discomfort, would not be enough to find that he knowingly raped her. The Court requires that a jury find he subjectively understood S.'s words and conduct to mean she did not want sexual intercourse, not that he should have known from her statements and body language that she did not consent. This effectively gives Hamernick a pass to not comprehending the basics of consent under § 45-5-501(1)(a)(i), MCA. Hamernick testified at trial that he "absolutely" takes "consent seriously." Yet even if, as Hamernick believes, the encounter started out consensually, he admits that S. clearly expressed through both her words and her conduct that any consent he believed to have been given was withdrawn. *See* § 45-5-501(1)(a)(i), MCA. Hamernick admitted at trial that S. was visibly uncomfortable and that she was saying "no," though he maintains it was "playful." Hamernick also admitted that S. always was uncomfortable with his sexual contact and repeatedly indicated that she did not want him touching her. The question for the jury was to determine *when* Hamernick should have gotten the message that there was no "freely given agreement." Given that factual dispute, I would conclude that the District Court did not abuse its discretion when it instructed the jury it could convict Hamernick if it found he was aware of a high probability that S. did not

22

consent to sexual intercourse. Taken as a whole, the instructions fully and fairly instructed the jury as to the applicable law. *Deveraux*, ¶ 20.

¶39 Finally, I would conclude that the instruction did not in any event deprive Hamernick of a fair trial by lowering the State's burden to prove all elements of the offense beyond a reasonable doubt, including proof that Hamernick acted knowingly. The Court acknowledges that the jury would be permitted to infer from all the facts and circumstances that Hamernick acted without S.'s consent. Opinion, ¶ 26. The difference between telling the jury it could convict if it found from all the facts and circumstances that Hamernick should have known—by a high probability—she did not consent versus telling the jury it could infer Hamernick's knowledge that she did not consent is immaterial to Hamernick's substantial rights. The instructions the court gave authorized the jury to acquit Hamernick had it believed his testimony. The verdict shows it did not. This case should not have to be retried. I dissent from the decision to reverse Hamernick's conviction.

/S/ BETH BAKER

Justice James Jeremiah Shea and Justice Laurie McKinnon join in the dissenting Opinion of Justice Baker.

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON

Justice Laurie McKinnon dissenting.

¶40 I write separately because it is my view there are two elements to SIWOC— (1) sexual intercourse, and (2) without consent—and it was therefore appropriate to give a

23

conduct-based instruction for the element of sexual intercourse and an existence-in-fact instruction for the element of without consent. I would begin by asking whether the legislature intended or understood a victim's lack of consent to be part of the "conduct" regulated by § 45-5-503, MCA, the SIWOC statute. I would answer that question no. In my opinion, lack of consent is a separate element from the conduct element of the SIWOC statute and the existence-of-fact based knowingly definition is required.

¶41 I acknowledge that my conclusion is to some degree in tension with our decision in *Deveraux*, which held that "without consent" gave rise to the entire criminal offense. However, the propriety of giving an *additional* "existence-of-fact" instruction for the mental state of "knowingly" was not at issue in *Deveraux*; rather, the issue was whether the court erred by giving a "conduct-based" instruction instead of a "result-based" instruction. *Deveraux*, ¶ 29. We held, under the issues there raised, that SIWOC was properly defined as a conduct-based offense for which the "knowingly" element was satisfied if the person was aware of his own conduct. *Deveraux*, ¶ 32. That remains true, in my opinion, as to the "act" element of SIWOC—sexual intercourse; that is, a person must be aware of his conduct in having sexual intercourse. However, the remaining element of SIWOC requires "without consent," which I would conclude knowledge is established if a person is "aware of a high probability" the circumstance or fact—consent–is either lacking or withdrawn. Although I joined the opinion in *Deveraux*, I have come to doubt its reasoning that "[f]or SIWOC, the prohibited particularized conduct itself—engaging in sexual intercourse with another person without that person's consent—gives rise to the entire criminal offense, and requires only a conduct-based instruction."

24

*Deveraux*, ¶ 32. Instead, it is my view that the "conduct" or "act" requiring a conduct-based instruction is the act of sexual intercourse; while the victim's *factual* lack of consent requires knowledge of a high probability of the fact's existence. Thus, the jury was correctly instructed by the District Court on the mental state of "knowingly" when the court gave both a conduct-based instruction for "sexual intercourse" and an existence-of-fact instruction for "without consent."

¶42 My conclusion follows from the statutory definitions and text, which demonstrate the legislature intended the "conduct" consist of the sexual acts themselves described in the SIWOC statute, and the "without consent" element constituted an attendant fact or circumstance. Montana's general culpability provision specifies that "a person is not guilty of an offense unless, with respect to each element described by the statute defining the offense, a person acts while having one of the mental states of knowingly, negligently, or purposely." Section 45-2-103(1), MCA. As the SIWOC statute requires the mental state of "knowingly," the defendant must act "knowingly" with respect to each element described by the statute. Section 45-2-101(35), MCA, sets forth three definitions of "knowingly," and provides:

> "Knowingly"—a person acts knowingly with respect to *conduct* or to a circumstance described by a statute defining an offense when the person is aware of the person's own conduct or that the circumstance exists. A person acts knowingly with respect to the *result* of conduct described by a statute defining an offense when the person is aware that it is highly probable the result will be caused by the person's conduct. When knowledge of the existence of a *particular fact* is an element of an offense, knowledge is established if a person is aware of a high probability of its existence. Equivalent terms, such as "knowing" or "with knowledge," have the same meaning. (emphasis added).

25

Depending on the facts and nature of the offense, multiple instructions for "knowingly" may be needed to instruct the jury fully and fairly. *Hovey*, ¶ 22.

¶43    Turning to the statute at issue here, § 45-5-503, MCA, provides: (1) "A person who knowingly has sexual intercourse with another person without consent or with another person who is incapable of consent commits the offense of sexual intercourse without consent." The act described by the statute is "sexual intercourse." "Sexual intercourse" is defined in § 45-2-101(68)(a), MCA, and the legislature established a specific mental state in its definition that requires the "act" be done, relevant here, with a specific purpose of "arous[ing] or gratify[ing] the sexual response or desire of either party." Section 45-2-101(68)(a)(ii), MCA. "Consent" or "lack of consent" does not appear anywhere in the language the legislature used in defining sexual intercourse and, further, there is no requirement in the statute defining sexual intercourse that it be consensual or nonconsensual.

¶44    "Consent" was also defined by the legislature. In 2017, the legislature significantly revised the definition of consent which compels, in my opinion, an existence-of-fact instruction for the element of without consent. The statute provides, in relevant part:

> the term "consent" means words or overt actions indicating a freely given agreement to have sexual intercourse or sexual contact and is further defined but not limited by the following:
> (i)    an expression of lack of consent through words or conduct means there is no consent or that consent has been withdrawn;
> (ii)    a current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue does not constitute consent; and
> (iii)    lack of consent may be inferred based on all of the surrounding circumstances and must be considered in determining whether a person gave consent.

Section 45-5-501(1)(a), MCA. The statute, as in years past, continues to set forth those persons incapable of giving consent based on age or incapacity. Section 45-5-501(1)(b), MCA. It also sets forth other specific circumstances that present imbalanced power dynamics in relationships where the victim is deemed legally incapable of consent. Section 45-5-501(1)(b)(v)-(xii), MCA. Section 45-5-511, MCA, additionally provides a defense "[w]hen criminality depends on the victim being less than 16 years old, . . . [if the offender] prove[s] that the offender reasonably believed the child to be above that age." However, "[t]he belief may not be considered reasonable if the child is less than 14 years old." Section 45-5-511, MCA.

¶45 The current consent statute has made significant progress in recognizing that SIWOC occurs in a multitude of scenarios, relationships, and power imbalances—and the legislature recognized the previous statutory requirement of force or threat of force was ill-suited to the complexities of society and these complicated relationships. The statute particularizes numerous circumstances where the victim is either incapable of consent or factually has given or withdrawn consent. The language of the consent statute and its terms and provisions are factually driven and factually specific. Montana's consent statute attempts to address these societal ills and the legislature's efforts are inhibited by this Court's misplaced conclusion that only a conduct-based instruction applies in SIWOC cases. More to the point, I am not persuaded that the legislature intended to permit defendants to gratify their sexual desires by having sexual intercourse with nonconsenting individuals as long as the defendant does not have knowledge that the individual does not

27

consent—an inevitable result of applying the conduct-based definition of knowingly. The Court's holding makes mental state completely subjective and introduces a requirement of "positive" knowledge that would make deliberate ignorance a defense. One with a deliberate antisocial purpose in mind should not be allowed to shut his eyes to avoid knowing what would otherwise be obvious to all. The existence-in-fact based instruction for "knowingly" addresses a mental state in which the defendant is aware that the fact in question is highly probable but consciously avoids enlightenment. It differs from the conduct-based definition of knowingly only so far as necessary to encompass a calculated effort to avoid the sanctions of the statute while violating its substance. Whether a complainant has consented to sexual intercourse depends upon her manifestations of such consent as reasonably construed. If the conduct of the complainant under all the circumstances should reasonably be viewed as indicating consent to the act of intercourse, a defendant should not be found guilty because of some undisclosed mental reservation on the part of the complainant. Through its revisions to the consent statute, the legislature has taken significant action towards addressing the power dynamics and imbalances inherent in a multitude of human relationships. I object to overriding these legislative efforts to advance Montana's consent statute into the twenty-first century by the Court making the mental state of knowingly completely subjective and requiring the defendant have actually known of the victim's lack of consent, even though any reasonable person would have known there was no consent.

¶46 The statutory definitions and text support the conclusion that the legislature would have understood that a victim's lack of consent in the SIWOC statute to be a circumstance

28

or fact, and not part of the actor's conduct. Therefore, the legislature did not intend a conduct-based mental state be applied to lack of consent. I would conclude that for the element of "without consent," an existence-of-fact based mental state reflects the legislature's purpose in enacting the consent statute. I would affirm the District Court, not only because it did not abuse its discretion under these facts, but because it instructed the jury on mental state correctly as a matter of law.

/S/ LAURIE McKINNON

29