FILED

03/18/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0556

DA 22-0556

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 52N

STATE OF MONTANA,

     Plaintiff and Appellee,

  v.

PITASKUMMAPI DAVID GREEN,

     Defendant and Appellant.

APPEAL FROM:   District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-2020-708
Honorable Jason Marks, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

     Penelope S. Strong, Attorney at Law, Billings, Montana

     For Appellee:

     Austin Knudsen, Montana Attorney General, Thad Tudor, Assistant
Attorney General, Helena, Montana

     Matthew Jennings, Missoula County Attorney, Ryan Mickelson,
Deputy County Attorney, Missoula, Montana

Submitted on Briefs:  December 11, 2024

Decided:  March 18, 2025

Filed:

                       _____
                              Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Pitaskummapi David Green (Green) appeals his judgment of conviction, entered upon jury trial in the Fourth Judicial District Court, of sexual intercourse without consent (SIWOC), a felony, in violation of § 45-5-503(1), MCA. He contends that his trial counsel provided ineffective assistance, and that we should exercise plain error review of instructional error. We affirm.

¶3 On December 16, 2020, the State charged Green with one count of SIWOC, alleging that Green raped longtime family friend, S.D. S.D., a 75-year-old woman, described Green, a 30-year-old man, as a "surrogate son" who she had known since he was 16 years old. S.D.'s relationship with Green included providing school clothes for him, feeding him, helping Green with homework, and giving him a place to stay when needed. When Green was 19 years old, S.D. took him in and he lived at S.D.'s apartment for several months. Green has an 11-year-old son with S.D.'s niece, Menahke Fish (Fish), and S.D. has made attempts over the years to foster the relationship between Green and the child, which have been largely unsuccessful. Prior to the incident in question, S.D. had not seen Green for a little over a year.

¶4     The jury trial was conducted in April 2022. The State called S.D., two of her daughters, a Missoula police officer, a Missoula Police Department detective, a Sexual Assault Nurse Examiner (SANE), Green's employer, and a Montana Crime Lab DNA supervisor and analyst. The defense called Green to testify on his own behalf. The facts of the incident as presented at trial are summarized below.

¶5     In the early morning of December 9, 2020, Green knocked at S.D.'s apartment door. S.D. was asleep, but upon waking promptly came to the door. She asked who was there, and Green replied, "Aunt [S.D.], it's me, let me in." S.D. testified it was unusual for Green to come at that hour, and she thought "he was in trouble or something." She said that Green appeared "all shaggy, dirty, [and] agitated," smelling of alcohol. Later, when initially questioned by police, Green admitted to drinking heavily and using methamphetamine that night, a combination that had led him to "black out" on other occasions. However, at trial, Green provided contradictory testimony, first, on cross-examination denying any methamphetamine use and stating that he initially lied to police, and then, on redirect, returning to the account he had initially told police—that he had used methamphetamine and alcohol that night prior to going to S.D.'s apartment.

¶6     S.D. unlocked the door and then went directly to her room to get a blanket to cover herself, as she was still in her nightgown. Green told S.D. that he had been at a party at his cousin's house earlier, that they were drinking all night, and that Green left because he could not be late for work. S.D. suggested Green take a shower to clean up while she put on a pot of coffee. Green entered the bathroom and turned on the water, while S.D. made herself a cup of coffee and placed a cup next to the coffee pot for Green to use after his

shower. S.D. heard the shower running and heard Green suggest that she join him in the shower, which struck her as very unusual, as he had never said anything like that before. She sat down in her recliner. A few minutes later Green exited the bathroom naked, still disheveled, and appearing as if he had not yet showered. Green positioned himself behind S.D. and began trying to fondle S.D.'s breasts, saying that he had "been planning this for a long time." S.D. related that she was in shock, Green's demeanor was that "this is going to happen and you have no way of stopping it," and Green was "jerking on himself and masturbating and that," followed by this testimony:

> He's grabbing my legs and that and his hand was under my nightgown and that, and he eventually—he couldn't get an erection and then he grabbed me by my shoulders and pushed me, then over to the couch and I was still hugging my blanket and that and we fought and we fought and I kicked and told him to go home and that, and he stuck his finger in my vagina and made the comment nice and tight. And then he was on top of me and he was trying to put his penis in me and he was too high [directionally] and he was really hurting me. And then he said, I have to feel wet, I have to feel wet. And then he finally with his finger he found wet and it was over in two seconds and that, and I was shaking and that, he got up and he looked at the clock or his watch or something and said, [o]h, I'm late. And he bent down, kissed me on top of the head and said, "[s]ee you later, Aunt [S.D.]," and walked out of the door.

S.D. said Green's attempt to penetrate her caused "excruciating pain," but that she continued to resist, explaining, "I was able to fight that and keep that and that, but then he just got more forceful and more forceful." She said that she told Green, "[g]o home to your wife. Leave me alone. Why are you doing this? I helped you just like your mother did, things of that nature."

¶7 Describing how she felt after the assault, S.D. testified:

4

I felt defeated. I felt betrayed. I felt humiliated. I felt like dirt. I was in disbelief. I laid in that position on the couch gripping my blanket for I don't know how long, how long I laid there. But I know I did not get up and take a shower until sometime in the late afternoon.

Asked why she felt disbelief, S.D. added:

Because I trusted him. I totally trusted him. And that's not—I did not live my life in a bad way to be so humiliated. . . . I'm just not the same person and I can't make myself become that person I was before. I can't stand anybody behind me. I have PTSD. I barely leave my apartment. I don't have trust in anybody. It's just—its just I'm not me anymore. It changed my life.

¶8 Green testified, and provided a brief account of the encounter:

I came out [of the bathroom]. I sat down in the recliner and then we started talking about having sex, and she agreed. She took off her underwear and then we moved over to the couch and I started using my fingers as foreplay and then the sex occurred and then it was over real quickly and then after that she was like angry at me. And then we got into an argument about the money that I owed her. And then after that happened I knew it was time to leave so I left.

¶9 On December 10, 2020, a day after the incident, S.D. texted Elizabeth Wilks (Wilks), one of S.D.'s daughters, who lived next door. Wilks entered S.D.'s apartment and found S.D. wrapped in her blanket, visibly shaken. Upon learning what happened, Wilks contacted her sister, Sara Williamson (Williamson), who lives in Helena and drove to Missoula to be with S.D. Wilks also contacted S.D.'s sister, who relayed the report to her daughter, Fish, who shared a son with Green. Fish contacted law enforcement, and Williamson took S.D. to an examination with Jacqueline Towarnicki (Towarnicki), a certified SANE nurse who had performed over 200 such examinations. S.D. reported her injuries to Towarnicki, stating that "both her shoulders and her chest was hurting," and "both of her hips were hurting and her vaginal area was also hurting." S.D. reported that

5

she physically could not urinate the day of the assault. After the examination, Towarnicki also reported hemorrhaging of the cervix and vaginal walls, and cervical discoloration consistent with bruising, which she also described as "significant genital trauma." Towarnicki noted injuries including "bruises to her torso," "a lot of areas of tenderness and pain . . . her shoulders, her chest, and her hips," and "separation of tissue just below the urethral opening." In describing these injuries, Towarnicki testified as follows:

> Q. So you noted petechia and images consistent with bruising on [S.D.'s] cervix, hemorrhages all around her vaginal walls?
>
> A. Yeah, that was the most significant.
>
> Q. A tear in her vaginal tissue just next to her urethra; are these the kinds of things you would expect to find during normal sexual intercourse?
>
> A. No.

¶10 Defense counsel pointed to S.D.'s delay in reporting the assault as suspicious and as undermining her account. Under examination by the prosecutor, S.D. addressed the delay:

> Q. And can you describe to me the rest of that day for you. What were you thinking? What were you feeling during that day, December 9th?
>
> A. I was totally, totally – I don't even know if I talked to anybody that day. I was just totally out, like an out-of-body experience. I just was in disbelief.
>
> Q. Did you consider that day telling somebody what happened?
>
> A. I was embarrassed. I was totally embarrassed. It wasn't until the next day that in the morning I just broke down crying and I called one of my daughters and I told her what had happened and I told her she couldn't tell anybody. But she did.
>
> Q. Let's talk about that. What was it about somebody knowing that you were concerned about?

A. I kept thinking of [Fish's and Green's son]. I kept thinking of my niece and that everybody would look at me different.

¶11 Green provided an account at trial that conflicted with his initial statements to police. In their investigation, police approached Green and asked if it was possible that "something bad happened [at S.D.'s apartment]," to which he responded, "I don't know what happened to tell you the truth." Police asked if it was "possible that you sexually assaulted [S.D.]," again to which Green responded "I don't know, I don't know. I can't give you guys a solid answer. I don't know. I want to tell you something but I don't have nothing to tell because I don't know." Then, at trial, Green testified he had given these responses because he did not trust police, and they had not provided an attorney for him to consult. Ultimately, Green acknowledged at trial that sex did occur, but contended it was consensual, and that upon discussing sex, S.D. "just said yeah, and then she took off her underwear." Defense counsel's closing argument offered the theory that S.D. had consented, and she had lied about giving consent due to the embarrassment of having consensual sex with the much younger Green, while the State argued that S.D. did not consent, and that the violent assault had caused serious long-lasting physical and emotional damage.

¶12 Green's two trial attorneys withdrew their proposed jury instructions, and the District Court gave the instructions to the jury as stipulated. Relevant here, the District Court defined elements of the charge as follows:

> A person who knowingly has sexual intercourse with another person without consent commits the offense of [SIWOC]. To convict the defendant of [SIWOC], the State must prove the following elements[:] one, the defendant

7

had sexual intercourse with [S.D.] and two, the act of sexual intercourse was without the consent of [S.D.], and three, the defendant acted knowingly.

Green's counsel did not submit any of the pattern jury instructions regarding the definition of "knowingly." The State proposed Jury Instruction No. 12, to which defense counsel did not object and which was given by the District Court: "A person acts knowingly when with respect to a specific fact, when the person is aware of a high probability of the fact's existence." The jury returned a verdict of guilty of SIWOC and found that Green had inflicted bodily injury to S.D. Green was sentenced to 80 years at the Montana State Prison and designated a level III sex offender. Green appeals.

¶13 A claim of ineffective assistance of counsel is a mixed question of law and fact which this Court reviews de novo. *State v. Walter*, 2018 MT 292, ¶ 10, 393 Mont. 390, 431 P.3d 22 (citation omitted). "When a defendant raises ineffective assistance of counsel claims on direct appeal, we must first determine whether the claims are more appropriately addressed in a postconviction relief proceeding." *State v. Secrease*, 2021 MT 212, ¶ 14, 405 Mont. 229, 493 P.3d 335 (citing *State v. Rodriguez*, 2021 MT 65, ¶ 31, 403 Mont. 360, 483 P.3d 1080). A claim of ineffective assistance of counsel will be appropriate for review on direct appeal when "'no plausible justification' exists for the actions or omissions of defense counsel," which can include a failure of counsel to seek the correct "knowingly" instruction. *Secrease*, ¶¶ 14-15 ("[W]e conclude there is no plausible justification for the failure of [defense counsel] to seek the correct 'knowingly' jury instruction . . . and this matter is appropriate for review on direct appeal.").

8

¶14 "The standard of review for jury instructions is whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case." *State v. Kirn*, 2023 MT 98, ¶ 16, 412 Mont. 309, 530 P.3d 1 (citing *State v. Dunfee*, 2005 MT 147, ¶ 20, 327 Mont. 335, 114 P.3d 217). "We review a trial court's decision regarding jury instructions for abuse of discretion." *Romo v. Shirley*, 2022 MT 249, ¶ 62, 411 Mont. 111, 522 P.3d 401. "If the jury instructions contain a mistake, we only find reversible error when the defendant's substantial rights are prejudicially affected." *State v. Bryson*, 2024 MT 315, ¶ 25, 419 Mont. 490, 560 P.3d 1270 (citing *State v. Deveraux*, 2022 MT 130, ¶ 20, 409 Mont. 177, 512 P.3d 1198).

¶15 Green argues his attorneys failed to provide effective assistance of counsel when they did not propose the correct "conduct-based" jury instruction regarding the definition of "knowingly," or object to the incorrect instruction that was given to the jury. Green also argues that this issue implicates his substantial rights and is therefore appropriate for plain error review.

¶16 A person commits SIWOC when the person "knowingly has sexual intercourse with another person without consent . . . ." Section 45-5-503(1), MCA. "When a criminal offense requires that a defendant act 'knowingly,' the [d]istrict [c]ourt must instruct the jury on what the term 'knowingly' means in the context of the particular crime." *State v. Hamernick*, 2023 MT 249, ¶ 16, 414 Mont. 307, 545 P.3d 666 (internal quotations omitted) (quoting *State v. Azure*, 2005 MT 328, ¶ 20, 329 Mont. 536, 125 P.3d 1116). Section 45-2-101(35), MCA, provides three distinct definitions for "knowingly":

[(1)] [A] person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when the person is aware of the person's own conduct or that the circumstance exists.

[(2)] A person acts knowingly with respect to the result of conduct described by a statute defining an offense when the person is aware that it is highly probable that the result will be caused by the person's conduct.

[(3)] When knowledge of the existence of a particular fact is an element of an offense, knowledge is established if a person is aware of a high probability of its existence.

Section 45-2-101(35), MCA. In *Hamernick*, we held that "[t]he crime of SIWOC is a conduct-based offense, necessitating an 'awareness of conduct' mental state instruction." *Hamernick*, ¶ 26 (citing *Deveraux*, ¶¶ 31-32).

¶17 Here, the State proposed the only "knowingly" instruction, and, without objection, the District Court gave that instruction: "[A] person acts knowingly when with respect to a specific fact, when the person is *aware of a high probability of the fact's existence*." (Emphasis added.) It is clear from our caselaw that the correct jury instruction for a SIWOC case is the "conduct-based" instruction, and not the instruction given as Jury Instruction No. 12. *See Hamernick*, ¶ 26; *Deveraux*, ¶¶ 31-32. However, the State argues that the error did not prejudice Green's rights or undermine the fundamental fairness of this proceeding, and thus Green can neither demonstrate a claim for ineffective assistance of his trial counsel nor a basis for plain error review.

¶18 The Montana Constitution and the United States Constitution guarantee criminal defendants the right to counsel. *Whitlow v. State*, 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861 (citing U.S. Const. amend. VI; U.S. Const. amend. XIV; Mont. Const. art. II, § 24). To address a claim of ineffective assistance of counsel Montana has adopted the

10

two-part test articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), whereby "a defendant must prove (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defense." *Whitlow*, ¶ 10; *see also Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. Satisfying the first prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and the second prong requires "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. Importantly, under the second prong, the client must demonstrate that, but for counsel's unprofessional conduct, the results of the proceedings would have been different. *State v. Jefferson*, 2003 MT 90, ¶ 53, 315 Mont. 146, 69 P.3d 641 (citing *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). "[I]f an insufficient showing is made regarding one prong of the test, there is no need to address the other prong." *Bryson*, ¶ 29 (quoting *Whitlow*, ¶ 11). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

¶19 Regarding the second prong of the analysis, Green argues that defense counsel's failure to have knowledge of, research, and ascertain the correct jury instruction, coupled with counsel's failure to object to the incorrect instruction, unfairly prejudiced Green's substantial rights by improperly lowering the State's burden of proof and relieving the State of its burden to prove whether the victim consented to engage in the sexual conduct. The

11

State counters that the jury instruction, while erroneous, did not prejudice the defense because the jury, by accepting S.D.'s version of facts and the State's only theory, necessarily determined from the evidence that Green in fact acted with awareness of his conduct and an awareness of S.D.'s lack of consent, as required by the correct mental state definition.

¶20 We agree with the State's argument. Green's defense was that S.D. gave verbal consent, and Green testified briefly as to the words and action of S.D. which conveyed her consent—"[s]he just said yeah, and then she took off her underwear." As detailed above, S.D. presented a starkly contrasting account, which, if believed, overwhelmingly established the requisite mental state, whereby Green was aware of his own conduct, and was aware that S.D. did not consent. The jury, as the trier of fact, weighed the conflicting evidence, and chose to believe S.D.'s testimony. The version of events presented by S.D. necessarily demonstrated Green was aware of his own conduct, including awareness that the sexual intercourse was without S.D.'s consent. While Green relies on *Hamernick*, the central issue there was whether the defendant had knowingly engaged in sexual intercourse without consent, given the victim's initial consent to some physical contact, and thus the incorrect mental state jury instruction directly impacted the proffered defense. *Hamernick*, ¶ 23 ("The jury's legal basis for acquitting Hamernick, if he was believed factually, was seriously eroded by the prosecution's position, permitted by the instruction, that he was guilty under the law even by his own version of the incident."). In contrast to *Hamernick*, whether Green acted knowingly is not the issue; rather, he conceded he acted knowingly, and the issue was whether S.D. had consented to sex. On this record, we conclude that

12

Green was not prejudiced by the incorrect jury instruction, and therefore Green's claim of ineffective assistance of counsel fails the second prong of the *Strickland* test.

¶21 Generally, this Court does not review issues raised for the first time on appeal, as this faults the lower courts for failing to rule correctly on an unraised issue. *State v. Long*, 2005 MT 130, ¶ 35, 327 Mont. 238, 113 P.3d 290 (citing *Unified Industries, Inc. v. Easley*, 1998 MT 145, ¶ 15, 289 Mont. 255, 961 P.2d 100). "[W]e may, in our discretion, review an unpreserved objection if it implicates a fundamental constitutional right and plain error review is necessary to avoid a manifest miscarriage of justice, leaving an unsettled question regarding the fundamental fairness of the proceeding, or otherwise compromising the integrity of the judicial process." *State v. Trujillo*, 2020 MT 128, ¶ 6, 400 Mont. 124, 464 P.3d 72 (citing *State v. Dahlin*, 1998 MT 113, ¶ 14, 289 Mont. 182, 961 P.2d 1247). "Whether an unpreserved error warrants plain error review is a question of law reviewed de novo." *Trujillo*, ¶ 6 (citing *State v. Stratton*, 2017 MT 112, ¶ 7, 387 Mont. 384, 394 P.3d 192). The party requesting plain error review "bears the burden of firmly convincing this Court that the claimed error implicates a fundamental right and that such review is necessary" to avoid the aforementioned issues. *Bryson*, ¶ 24. This Court exercises plain error review only in extraordinary circumstances. *Trujillo*, ¶ 6 (citing *State v. Mitchell*, 2012 MT 227, ¶ 10, 366 Mont. 379, 286 P.3d 1196).

¶22 Given the clear lack of prejudice the erroneous jury instruction inserted into the proceedings, as discussed above for purposes of the IAC claim, and the overwhelming evidence the jury relied upon to find Green guilty of SIWOC, which established the requisite conduct-based mental state, Green has not "firmly convinced this Court" that the

13

inclusion of the incorrect result-based jury instruction implicated a fundamental right whereby plain error review became "necessary to avoid a manifest miscarriage of justice, leaving an unsettled question regarding the fundamental fairness of the proceeding, or otherwise compromising the integrity of the judicial process." *Trujillo*, ¶ 6. We therefore hold that Green is not entitled to plain error review.

¶23 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. This appeal presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent.

¶24 Affirmed.

/S/ JIM RICE

We Concur:

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON

14