FILED

11/12/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0248

DA 23-0248

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 257

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

DILLON PATRICK PIERCE,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DC-21-13
Honorable Robert J. Whelan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Tammy A. Hinderman, Appellate Defender Division Administrator,
Michael Marchesini, Managing Appellate Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

          Matt Enrooth, Butte-Silver Bow County Attorney, Michael Clague,
Deputy County Attorney, Butte, Montana

          Submitted on Briefs:  March 12, 2025

                    Decided:  November 12, 2025

Filed:

          _____
                        Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Dillon Pierce (Pierce) appeals his conviction of sexual intercourse without consent (SIWOC) after a jury trial in the Second Judicial District Court. The State alleged Pierce sexually assaulted K.R. when she was intoxicated and unable to consent. Pierce asserted he did not know K.R. was unable to consent to sex because she had spoken to him on a call, invited him to her residence and gave him the address, messaged him that her door was unlocked, engaged in other activities, and did not appear physically helpless. The District Court denied the defense's request to present expert testimony relating to K.R.'s past alcohol use. It instructed the jury that Pierce acted "knowingly" if he was aware of the "high probability" that K.R. was unable to give consent. Pierce challenges the District Court's mental state instruction as erroneously reducing the State's burden of proof, and its evidentiary ruling excluding the defense expert. We consider:

1. *Did the District Court's mental state instruction constitute reversible error?*

2. *Did the District Court err by excluding character evidence and expert witness testimony?*

We reverse and remand for a new trial.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2 K.R. spent much of the afternoon of December 5, 2019, drinking at several bars in Butte. K.R.'s friend, McKenna, testified she was with K.R. before 2:00 p.m. at Mac's Tavern, where they each consumed "maybe three drinks." K.R. testified that she started drinking with McKenna around 3:00 p.m., at the Acoma Lounge and Bar, where she drank a "few beers" before McKenna left the Acoma to go to work. Around 4:35 p.m., K.R. went

2

to the Dublin Bar to meet another friend and had "a couple of drinks," including a Seagram's 7 Whisky and Seven-Up. Between 6:30 and 7:00 p.m., K.R. drove to Maloney's Bar, where she consumed at least one beer and a shot of brandy. K.R. spoke with two men at Maloney's about her welding job and used the restroom there.

¶3 K.R. and Pierce were acquainted through mutual friends and K.R.'s brother, who was a friend of Pierce's, and they had previously socialized together "a handful of times." They were also "friends" on Facebook, and during the time K.R. was at Maloney's Bar, Pierce, unaware at that point of K.R.'s drinking that day, sent K.R. a "wave" on Facebook—something he had done twice before, but to which K.R. had not previously responded. However, on this occasion, K.R. responded by sending a Facebook message to Pierce at about 8:50 p.m., saying, "Come drink." Pierce wrote back, inviting K.R. to his place. K.R. replied that she wanted to be in bed by 11:00 p.m. because she had to be at work at 5:00 a.m. the next day and told Pierce: "I got cash come drink." Pierce said K.R. could come over to his place and still be home by 11:00, and that he was "in my boxers." K.R. replied that she was going to stay at Maloney's for a while and invited Pierce again to "come drink." To this Pierce asked, "How and what would I get for doing so there lil lady?"

¶4 K.R. replied, "Imma head home so never mind." Pierce replied, "Just come drink here," but K.R. again stated she had to be at work at 5:00 a.m. After Pierce replied that he had to be at work at 6:00 a.m., K.R. messaged him, "I gotta find my rig. I'm fucked ip [sic]." Pierce responded, "Jesus[.] Yeah then come here," and K.R. said, "Tell me about it." After Pierce offered, "Kinda bad that you forget [sic] that," K.R. said, "I found it," to

3

which Pierce replied, "Good job!!" K.R. said she was close to home and was "probably gonna head there," to which Pierce replied, "I don't live far from Maloney's."

¶5    K.R. then called Pierce using Facebook Messenger, and their call lasted 1 minute and 11 seconds. There is no record of the contents of that conversation. After that call, K.R. drove home from Maloney's and carried in groceries she had purchased earlier in the day, placing them under her pool table. K.R. messaged Pierce and said, "I'm home." Pierce responded, "I'll be there soon," and asked, "What's the address again[?]" K.R. then provided Pierce with her address. Pierce stated, "Give me twenty I'll be there." In her last message to Pierce, she stated: "My door[']s unlocked."

¶6    However, K.R. testified that she did not remember the conversation with Pierce, the messages to and from Pierce, driving home, carrying in the groceries, or leaving her door unlocked. K.R. remembered nothing after talking to the two men and using the restroom at Maloney's until she "came out of a fog" at home, in her bed, unclothed from the waist down with her underwear in her hands, and having a sexual encounter with a man who she did not recognize. She testified she told the man to "stop," but that he pushed her head into a pillow, told her, "you asked for it," and continued. K.R. could not state the encounter's length thereafter, only that the man got up, asked where her bathroom was, and used the bathroom. He asked if her stove was on and if her dog had had an accident, before leaving the house. K.R. was unsure whether the man had ejaculated or used a contraceptive.

¶7    After the man left, K.R. called her friend Ellie, who lived in Anaconda, and told her what had happened. K.R. could not identify the man. Ellie, who testified that K.R. was crying during the call, suggested K.R. check her phone. K.R. opened Facebook Messenger

4

and saw her conversation with Pierce. Ellie relayed what had happened to another friend, McKenna, because McKenna lived closer to K.R. McKenna called the police and met Officer Knopp at K.R.'s house. Ellie asked Pierce by text if he had been to K.R.'s house earlier in the evening and Pierce replied that he had not. He messaged K.R. and asked why Ellie was contacting him, telling K.R. that he had told Ellie he had not been to her house, and that he did not know why Ellie was asking. He added, "I keep things private . . . ."

¶8 Officer Knopp arrived at K.R.'s house with McKenna at 12:51 a.m. on December 6, 2019. Answering on cross examination whether K.R. "appear[ed] to be intoxicated," McKenna answered, "she didn't," and confirmed that answer during further questioning. Officer Knopp reported that K.R. was "crying the entire time" during their conversation, but her written report did not indicate K.R. was intoxicated or smelled of alcohol. At trial, however, Officer Knopp testified K.R. "appeared to be intoxicated" and that she "could smell alcohol on her, as well." Officer Knopp noted there were groceries on K.R.'s pool table, and she had brought in a can of chili she had found lying in the driveway. Officer Knopp also noticed K.R.'s bed "was a mess" because the dog had defecated on the sheets and floor. Officer Knopp noted that K.R. was "hugging herself" with her knees curled up into her body, which she testified was "common with people who have been assaulted." According to Officer Knopp, K.R. was reluctant to go to the hospital, but eventually she went with McKenna.

¶9 McKenna drove K.R. to the emergency room. McKenna testified that K.R. did not seem "overly intoxicated" and that she had no concerns about K.R. being able to understand what was going on at the time. Around 2:45 a.m., K.R. gave blood and urine

samples for toxicology testing. She had to wait for a qualified sexual assault nurse examiner (SANE) to perform an evaluation, which began shortly after 9:00 a.m. By that time, Ellie had visited K.R. in the hospital, and she testified K.R. was aware of what was happening and did not exhibit signs of intoxication. The SANE nurse similarly noted that K.R. seemed tired and sad, but not intoxicated. The nurse identified some bruising on K.R.'s knees and some scratches on K.R.'s wrist and torso, which she later testified were likely not a result of the sexual encounter. The nurse also checked two boxes on a form indicating K.R. said she had lost her memory and had a lapse of consciousness. A black light revealed a deposit of bodily fluid on K.R.'s labia, which the nurse collected with a skin swab and sent for further testing. No sign of external vaginal injury was noted, and K.R. declined an internal pelvic exam. K.R.'s blood sample showed a blood alcohol content (BAC) of 0.148, and the alcohol level in her urine was 0.218. The skin swab for bodily fluid contained traces of sperm that matched Pierce's DNA.

¶10 K.R. was interviewed by Detective Sullivan of the Butte-Silver Bow Law Enforcement Department. K.R. did not remember additional details about the encounter with Pierce beyond what she had reported to Officer Knopp but, when asked directly if Pierce had ejaculated, it appeared to Detective Sullivan that K.R. said, "no." Detective Sullivan later testified that K.R. was somewhat difficult to understand because "[s]he's a very quiet talker" and "mumbles."

¶11 In February 2021, the State charged Pierce by Information with SIWOC. The defense filed a notice of intent to introduce character evidence pursuant to M. R. Evid. 404(a)(2) and 404(c). Lengthy discovery proceedings followed and, a year later, in

6

February 2022, the State filed motions in limine requesting exclusion of character evidence and anything concerning K.R.'s past sexual conduct.

¶12 The District Court conducted a hearing on the pretrial motions, beginning with the State's motion in limine to exclude character evidence and the defense's proposed expert witness, Dr. William George, a psychology professor at the University of Washington. The State argued:

> The State's theory of the case is that in this matter the victim consumed alcohol to the point where she was passed out and then she could not consent to intercourse. When she woke up, she said no, but the intercourse did not stop. . . . [W]e're assuming that the defense intends to cross-examine the victim about her past alcohol use and then use that information with their expert witness to show that she—she was such a functioning alcoholic that she did not appear intoxicated.

The parties argued about the admissibility of K.R.'s alcohol use under various Rules of Evidence. The defense said it was prepared to offer two witnesses with first-hand knowledge "to talk about how much [K.R.] drank, that she drank to the point where normal people would be intoxicated, that she drank beyond that point and she was able to still function." Regarding its expert, defense counsel said Dr. George was prepared to testify to "what [K.R.] did and that she acted in conformity with that on the occasion of the night of the allegations of this offense, that she drank a lot, she drank to high levels of intoxication, high levels of blood alcohol." Defense counsel argued it was "irrational for the State to be able to introduce evidence of intoxication as it bears on the mental state of the complaining witness, while a criminal defendant is categorically barred from introducing the same type of evidence as it bears on the defendant's mental state." Defense counsel also explained to the District Court that previous defense counsel had apparently

7

advised the State that Dr. George's testimony "would be, whether or not somebody who is a regular consumer of alcohol would be more functional at a higher level of intoxication."

¶13 Ruling from the bench, the District Court stated:

> I don't believe that someone's past drinking habits are admissible under the rules [of evidence]. I don't find it to be a character trait. I don't find it to be a habit that would be admissible under [Rule] 406. And I believe, at least it's going to be this [c]ourt's ruling that that evidence will be excluded.
>
> You are certainly welcome to question the victim with regards to her consumption of alcohol on the evening in question. I believe that is appropriate. And I believe going beyond that and talking about the history of her drinking habits would be highly prejudicial, and I don't find that admissible. And that's going to be the ruling of the [c]ourt with regards to that.
>
> Given that her past history of drinking [is] inadmissible, I don't know that Mr. George's testimony will be relevant in this matter. And that's going to be – obviously, if the defense has another reason to call Mr. George, the court can certainly consider that at the time, and we can go from there.

The District Court also entered a written order stating, "Dr. George's testimony is not relevant since the victim's prior alcohol use is inadmissible unless the Defendant provides another reason for Dr. George to testify as an expert."

¶14 A jury trial was held March 21-22, 2022. The State called K.R., Officer Knopp, Ellie, McKenna, the SANE nurse, Detective Sullivan, and two crime lab employees to testify, and proffered its theory that K.R. was too intoxicated to consent, arguing: "She was too drunk to know what was going on," and "When you're that drunk . . . you don't have the ability to consent." The prosecutor offered Officer Knopp's testimony in support of the State's theory, and, in response to the prosecutor's question about how a person's tolerance affects indications of intoxication, she stated: "People react differently at

8

different BAC levels. So somebody with a very high tolerance would show *more* signs of impairment at the same blood alcohol content as somebody who doesn't have as high of a tolerance." (Emphasis added.) The thrust of this testimony—that a person with "high tolerance" of alcohol would show "more" signs of impairment—may have bolstered the State's case that K.R. was too intoxicated to consent, and thus presented in that condition to Pierce. The testimony, however illogical and facially questionable, was not further addressed and directly undercut Pierce's defense that, while K.R. may have gone into a "blackout" state of drunkenness wherein she could not remember her actions, due to her high tolerance for alcohol, she presented to Pierce as functional, and therefore he did not know she could not consent to sex. Pierce exercised his Fifth Amendment right to not testify.

¶15 During settlement of jury instructions, defense counsel proposed a conduct-based mental state jury instruction for SIWOC, which read: "A person (Dillon Pierce) acts knowingly with respect to whether or not [K.R.] consented to sexual intercourse when Dillon Pierce is aware that [K.R.]: 1) expressed lack of consent through words or conduct; or 2) was physically helpless." Defense counsel explained, "[t]his is a conduct-based offense, and so he has to knowingly—Mr. Pierce, to be convicted, has to know" that K.R. did not consent or was incapable of consenting, adding that the proposed instruction clarified "what the state has to prove in terms of what Mr. Pierce knew at the time." The State objected and asked for a result-based mental state instruction, noting that this mirrored the Model Criminal Jury Instructions (MCJI) requiring defendants to be aware of the high probability their conduct will result in a crime. The District Court denied the

defense's proposed instruction, stating it was "concerned that the instruction is going to cause confusion with the jury. I do believe that the knowingly standard is covered by the standard instructions that have been given by the state." Consequently, the instructions approved, relevant to this appeal, were as follows:

> Instruction 15. A person acts knowingly when the person is aware there exists a high probability that the person's conduct will cause a specific result.

> Instruction 19. As used in these instructions, the term "consent" means words or overt actions indicating a freely given agreement to have sexual intercourse or sexual conduct. . . . Lack of consent may be inferred based on all the surrounding circumstances and must be considered in determining whether a person gave consent.

> Instruction 20. A person who is incapable of consent means a person who is physically helpless.

> Instruction 21. Physically helpless means a person is unconscious or otherwise physically unable to communicate unwillingness to act.

¶16 The State's closing arguments repeatedly articulated the "high probability" mental state provided by Instruction 15, even applying the "high probability" standard to Pierce's perception of his chances of engaging in sexual intercourse with K.R. that evening:

> [Pierce] knew that there was a high probability that "if I go to [K.R.]'s house when she's this intoxicated she can't consent." He knew that there was a high probability because she couldn't consent. "I can take advantage of that." He knew that there's a *high probability that "When I go in that house . . . I'm going to get my hookup."* That's what Dillon Pierce knew. That's what Dillon Pierce did.

> . . .

> The defendant *knew there was a high probability because he wanted it, he wanted this hookup*.

10

(Emphasis added.) Defense counsel argued:

> And we talked about in voir dire about how if you say "no, don't, stop," is different than "no, don't stop." . . . There's no further discussion, clarification, nothing. But what she does say is that when she said stop, Mr. Pierce didn't finish. Take that for whatever it's worth. But the one thing she asks you to believe is that she remembers in all of that that she said no. Is that credible?

> . . .

> [K.R.] doesn't know how she took her clothing off. We know that her underwear ends up in her hand, though, by her head. How did it end up in her hand if she didn't look for it? Was she reaching for it? Was she looking for it? What happened with that? How did the underwear end up in her hand?
> Mr. Pierce has the right to rely on her actions and her statements and her allowing him or inviting him to come to her home. He has the right to rely on that. And he did rely on that. And whether or not you think that casual sex is an okay thing or whether a hookup is appropriate, they were two consenting adults that engaged in that act. End of story.

> . . .

> [Pierce] didn't have any idea that [K.R.] was as drunk as she was because she was fully functional. She was texting, she was driving, she was talking to the police, she was carrying in her groceries. How was he supposed to know?

¶17 During deliberations, the jury sent out a question, asking, "What happens if we don't come to a unanimous decision?" However, prior to receiving an answer, the jury reported it had reached a verdict. After deliberating for less than three hours, the jury returned a guilty verdict. The District Court sentenced Pierce to twenty years in Montana State Prison, with five years suspended.

¶18 Pierce appeals.

11

**STANDARD OF REVIEW**

¶19    In reviewing jury instructions, this Court assesses "whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case." *State v. Hamernick*, 2023 MT 249, ¶ 13, 414 Mont. 307, 545 P.3d 666.  We review a district court's jury instructions for abuse of discretion and will reverse the district court "only if the jury instruction prejudicially affected the substantial rights of the defendant." *State v. Doyle*, 2007 MT 125, ¶ 66, 337 Mont. 308, 160 P.3d 516 (citation omitted); *accord State v. Deveraux*, 2022 MT 130, ¶ 20, 409 Mont. 177, 512 P.3d 1198 (the "mistake must prejudicially affect the defendant's substantial rights in order to constitute reversible error"); *Hamernick*, ¶ 13.

¶20    We review a district court's evidentiary rulings for abuse of discretion.  *State v. Gomez*, 2020 MT 73, ¶ 40, 399 Mont. 376, 460 P.3d 926.  An abuse of discretion occurs when the district court "'acts arbitrarily, without conscientious judgment, or exceeds the bounds of reason,'" resulting in substantial injustice.  *State v. Bryson*, 2024 MT 315, ¶ 26, 419 Mont. 490, 560 P.3d 1270 (quoting *State v. Given*, 2015 MT 273, ¶ 23, 381 Mont. 115, 359 P.3d 90).

**DISCUSSION**

¶21    *1.  Did the District Court's mental state instruction constitute reversible error?*

¶22    Pierce argues the District Court erred by rejecting his proposed jury instruction for "knowingly," and by instructing the jury it could convict him if he was "merely aware of a 'high probability' K.R. could not consent to sex based on the amount of alcohol she drank that night."  Pierce contends that "[t]his incorrect instruction prejudiced [his] defense,

12

because the whole case was about what [he] knew," and "lowered the State's burden of proof on the key element in dispute at trial, violating [his] right to due process."

¶23 SIWOC is a crime in which the defendant "knowingly has sexual intercourse with another person without consent or with another person who is incapable of consent," and thus, the mental state of "knowingly" is a requisite element of the offense. Section 45-5-503, MCA (2019).[1] Montana law provides different definitions of "knowingly," including that "a person acts knowingly with respect to conduct . . . when the person is aware of the person's own conduct" and that a person "acts knowingly with respect to the result of conduct . . . when the person is aware that it is highly probable that the result will be caused by the person's conduct." Section 45-2-101(35), MCA (emphasis added).[2] The district court "must instruct the jury on what 'knowingly' means in the context of the particular crime." *State v. Rowe*, 2024 MT 37, ¶ 30, 415 Mont. 280, 543 P.3d 614.

¶24 This Court has held that the conduct-based instruction on "knowingly" is the correct instruction for sexual offenses. *See Rowe*, ¶ 31 ("a conduct-based definition is appropriate for the offenses of sexual assault, while a result-based definition is not"); *Hamernick*, ¶ 26 ("[t]he crime of SIWOC is a conduct-based offense, necessitating an 'awareness of conduct' mental state instruction"); *Deveraux*, ¶ 32 ("[f]or SIWOC, the prohibited

---

[1] All references to statutes cited herein are to the 2019 Montana Code Annotated, which was the governing law at the time of the events in question.

[2] The statute also provides an alternative definition of "knowingly" with respect to "knowledge of the existence of a particular fact," but the parties do not argue for this definition to be applied. *See Hamernick*, ¶ 24.

particularized conduct itself—engaging in sexual intercourse with another person *without that person's consent*—gives rise to the entire criminal offense, and requires only a conduct-based instruction") (emphasis in original); *State v. Gerstner*, 2009 MT 303, ¶ 29, 353 Mont. 86, 219 P.3d 866 ("[i]t is the particularized conduct of making sexual contact that the [sexual assault] statute makes criminal"). Here, however, despite defense counsel's argument in this regard that Pierce "has to know," the District Court gave a result-based definition of "knowingly," thus instructing the jury that Pierce could be convicted of SIWOC if he was aware merely of the "high probability" that his "conduct [would] cause a specific result."

¶25 The State concedes the District Court gave an erroneous jury instruction, but argues the error was harmless. Acknowledging the Court reversed *Hamernick* for giving this incorrect instruction, the State contends the reasons which required reversal in that case are not present here, and is distinguishable, arguing, "[u]nlike in *Hamernick*, where a factual dispute was developed regarding the defendant's knowledge of the extent and scope of the accuser's consent, here there was little dispute pertaining to Pierce's actual knowledge" about whether K.R. had consented. The State bases its argument on K.R.'s contention that she did not remember the Facebook Messenger conversations with Pierce, her view that none of those messages invited Pierce to have sex, Pierce's awareness that she described herself that night as "fucked ip [sic]," and that she provided undisputed testimony that she awoke during sex, said "stop," to which Pierce replied, "you asked for it" and pushed her head down. The State thus argues that, under the circumstances of this case, the

14

instructional error "would not have undermined Pierce's defense or would not have been prejudicial."

¶26     Pierce contends in reply that K.R.'s friends and the SANE nurse all testified that K.R. did not appear to be intoxicated; argues that the messaging between K.R. and Pierce was indeed sexually suggestive, including Pierce's response to K.R.'s repeated invitations to "come drink" with "what would I get for doing so there lil lady?", K.R. messaging that she was home, providing her address to Pierce in response to his request, and, lastly, messaging that her door was unlocked; that K.R.'s underwear ended up in her hand near her head; that K.R. was not clear in her statement about her interactions with Pierce during sex, including being unable to indicate the extent of any sexual contact after she said to stop, such that her testimony lacked credibility and jurors "may have doubted whether the State proved beyond a reasonable doubt that [Pierce] ignored K.R.'s request to stop and kept going"; and that, consequently, Pierce, as in *Hamernick*, had "put the issue of the defendant's knowledge of the accuser's consent squarely at issue."  Further, the defense introduced evidence that K.R. sent coherent messages to Pierce expressing a desire to be in bed by a specific time so she could work early the next morning; told Pierce when she found her vehicle and proceeded to drive home without incident; initiated a call to Pierce that lasted 1 minute and 11 seconds; carried in groceries; accurately described where she lived; and followed through on a stated intention to leave her door unlocked for Pierce. Pierce did not have any direct knowledge about how much K.R. had drunk prior to or during their communications.

15

¶27     The incongruency of both parties' positions in the case is evident.  The State argued that K.R. was "too drunk to know what was going on," yet that she also "unambiguously" told Pierce to stop; Pierce argues that others believed K.R. was not intoxicated and he likewise believed she was capable of giving consent, but that she had been drinking for a long time that day such that her testimony about their sexual contact was "tenuous" and "by no means conclusive of [his] guilt."  A review of the conflicting evidence demonstrates that a juror, depending upon the evidence accepted or rejected, could have reasonably found that Pierce did not engage with sexual intercourse with K.R. with the knowledge that she was unable to consent.

¶28     Consequently, we disagree with the State's argument that there was "little dispute" here about Pierce's knowledge, given that the trial focused heavily on K.R.'s capability of consenting and Pierce's awareness of her capability.  Pierce's due process right to a fair trial in a case involving extensive conflict regarding his knowledge required the jury to be correctly instructed on the elements of the charge that the State was burdened to prove, including that Pierce had to be aware that K.R. was incapable of consenting.  "Under the language of the statute, the crime does not consist of sexual intercourse with a high probability the other person does not consent; rather, it is sexual intercourse with the awareness that it is *without* that person's consent, which may permissibly be inferred from all of the facts and circumstances of the case."  *Hamernick*, ¶ 26 (emphasis in original); *see also Bryson*, ¶ 33 ("there is no difference in this regard between a SIWOC charge with a 'without consent' element and one with an 'incapable of consent' element").

16

¶29 This distinction is significant because, as Pierce argues and as we explained in *Gerstner*, instructing the jury that the Defendant "only had to be aware of the high probability" lowers the State's burden of proof. *Gerstner*, ¶ 31; *see Hamernick*, ¶ 23 ("Despite the language of the statute criminalizing the act of knowingly engaging in sexual intercourse 'without consent,' the State was relieved of proving that Hamernick knew his sexual conduct with S. was without her consent, instead needing to prove only that he was aware of 'a high probability' of such."). This distinction was not lost on the prosecutor, who read the incorrect instruction to the jury during his argument and then repeatedly argued that Pierce "knew there was a high probability" K.R. could not consent.[3] And, as Pierce notes, Pierce challenged K.R.'s testimony as lacking credibility in light of the entirety of their communications, and we do not know what testimony the jury rejected or accepted in support of its verdict. While this case differs factually from *Hamernick*, it is no less violative of the Defendant's rights, because, on this record, we cannot conclude the incorrect instruction about the critical element of the crime was harmless. Reversal is required when "the substantial rights of the defendant [are] affected." *State v. Ilk*, 2018 MT 186, ¶ 21, 392 Mont. 201, 422 P.3d 1219 (citing *State v. Rothacher*, 272 Mont. 303, 310, 901 P.2d 82, 87 (1995)). Jury instructions that "relieve the State of its burden to prove every element of the charged offense beyond a reasonable doubt violate the defendant's

---

[3] The prosecutor argued at times that Pierce knew there was "a high probability" he was "going to get my hookup," which, without more, does not encompass the elements of the crime. The prosecutor probably meant to argue, under the given instructions, that Pierce was aware there was a high probability that K.R. was incapable of consenting.

due process rights." *City of Missoula v. Zerbst*, 2020 MT 108, ¶ 10, 400 Mont. 46, 462 P.3d 1219.

¶30 The District Court's instruction on "knowingly" led the jury to believe they needed to determine whether Pierce was aware only of a high probability that K.R. could not consent, not whether he *was aware* K.R. could not consent, thereby lowering the State's burden on an essential element of SIWOC in violation of Pierce's due process rights.

¶31 *2. Did the District Court err by excluding character evidence and expert witness testimony?*

¶32 A defendant has a constitutional right to confront his accuser and a right to present evidence in his defense. *See* U.S. Const. amend VI; Mont. Const. art. II, § 24; *State v. Colburn*, 2016 MT 41, ¶ 24, 382 Mont. 223, 366 P.3d 258 (citing *State v. Johnson*, 1998 MT 107, ¶ 22, 288 Mont. 515, 958 P.2d 1182). Pierce argues that, by excluding expert witness testimony about whether people may be functional alcoholics, the District Court denied him the ability to defend himself against the State's primary theory: that K.R. was obviously too drunk to be able to consent to sexual intercourse. The State answers that the District Court correctly recognized Pierce's proffered evidence as an inadmissible attack on K.R.'s character.

¶33 The Rules of Evidence proscribe admission of character evidence "for the purpose of proving action in conformity therewith on a particular occasion," M. R. Evid. 404(a), but allow admission of "evidence of a pertinent trait of character," "evidence of other crimes, wrongs or acts" for non-propensity purposes, and evidence of a character trait "in cases in which character or a trait of character of a person is an essential element of a

18

charge, claim, or defense." M. R. Evid. 404. Additionally, the rules permit admission of "[e]vidence of habit or of routine practice, whether corroborated or not . . . to prove that conduct on a particular occasion was in conformity with the habit or routine practice." M. R. Evid. 406(b). The Rules "do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." *Johnson*, ¶ 22. "Thus, to resolve the tension between the defendant's right to present a defense and the victim's rights . . . , the district court must 'strike a balance in each case.'" *State v. Aguado*, 2017 MT 54, ¶ 33, 387 Mont. 1, 390 P.3d 628 (quoting *Colburn*, ¶ 25) *overruled on other grounds by State v. Johnson*, 2019 MT 34, ¶ 19, 394 Mont. 245, 435 P.3d 64.

¶34 We first conclude that the District Court did not abuse its discretion by excluding the proffered evidence of K.R.'s drinking habits. In *Bryson*, we encountered a similar issue. The accuser had consumed large amounts of alcohol in hours prior to the time Bryson had allegedly sexually assaulted her. Bryson argued "the District Court 'paralyzed' his defense" by excluding evidence of the accuser's past drinking habits, including that she had confessed to consuming a liter of vodka per day. *Bryson*, ¶¶ 13, 37. We concluded the District Court did not abuse its discretion by excluding such evidence because the court had balanced the defense's ability to "elicit that [the accuser] was an alcoholic" by cross-examining her about the events directly leading to the assault with the State's concerns about unfairly prejudicing the jury. *Bryson*, ¶ 38. Similarly, here, the District Court sought to achieve a balance by excluding evidence of K.R.'s past drinking habits as inadmissible character and habit evidence, while allowing the defense "to question the

victim with regards to her consumption of alcohol on the evening in question," which the defense did. We conclude the District Court did not abuse its discretion in excluding evidence of K.R.'s alcohol use prior to the relevant dates.

¶35 We also conclude, based upon the arguments made, the District Court did not abuse its discretion by excluding the testimony of Dr. George as an expert for the defense. On this issue, Pierce's arguments on appeal are significantly different than those made below. He frames the issue as whether the District Court erred by "exclud[ing] defense expert testimony about how regular alcohol use may cause a person to appear less intoxicated then their alcohol consumption and BAC would otherwise suggest," and, noting that the State introduced evidence of K.R.'s alcohol consumption, including her high BAC, to create an inference that "she was so drunk she was incapable of consent," Pierce argues the court "wrongly prohibited the defense from countering this with expert testimony about the effects of routine alcohol consumption on a person's perceptible level of intoxication."

¶36 However, the problem is that this was not the argument Pierce made to the District Court, and the basis on which he offered the expert testimony. Pierce cites several times to a single statement made by defense counsel during the motions hearing summarizing what prior counsel had advised the State, namely, that the proposed expert testimony would be "whether or not somebody who is a regular consumer of alcohol would be more functional at a higher level of intoxication," but that was not the purpose for which Dr. George's testimony was ultimately offered. Rather, after explaining that the defense would call two witnesses to testify about K.R.'s past heavy drinking, defense counsel explained that this evidence would demonstrate, along with Dr. George's testimony:

20

[T]hat she acted in conformity with that on the occasion of the night of the allegations of this offense, that she drank a lot, she drank to high levels of intoxication, high levels of blood alcohol, and we should be able to explore whether or not she was functional when she was doing that.

.    .    .

Rule 404 does allow the admission of a pertinent character trait. And the alcohol is a pertinent character trait.

¶37 It was this argument that led the District Court to exclude the evidence and Dr. George as an expert, reasoning that the "use of alcohol does not equate to a personality trait or to witness morality," and would "paint the victim as an alcoholic and be used to inflame the jury against the victim." The other potential line of expert inquiry, which Pierce argues on appeal, regarding "the effects of routine alcohol consumption on a person's perceptible level of intoxication," was not presented to the District Court and, likewise, was not preserved for appeal. *See State v. Ferguson*, 2005 MT 343, ¶ 38, 330 Mont. 103, 126 P.3d 463 ("It is well established that a party may not raise new arguments or change its legal theory on appeal."). It is certainly possible that expert testimony could have been admissible to, at a minimum, counter the testimony from Officer Knopp that "somebody with a very high tolerance would show *more* signs of impairment at the same blood alcohol content as somebody who doesn't have as high of a tolerance," and thus satisfy the District Court's indication to the Defendant that "another reason for Dr. George to testify as an expert" could be provided, but that argument was also not preserved and, because the case is returning to the District Court, other potentially permissible expert testimony need not be addressed further.

¶38 Reversed and remanded for further proceedings in accordance herewith.

21

/S/ JIM RICE

We Concur:

/S/ INGRID GUSTAFSON
/S/ KATHERINE M. BIDEGARAY
/S/ JAMES JEREMIAH SHEA

Justice Beth Baker, concurring in part and dissenting in part.

¶39    I join the Court's discussion and resolution of Issue 2.  I agree, too, that the District Court's instruction to the jury on the definition of "knowingly" was improper under this Court's precedent.  In light of the record evidence, however, I would conclude that the instructional error was harmless and affirm Pierce's conviction.

¶40    The Court made clear in *Hamernick* that the offense of Sexual Intercourse Without Consent "does not consist of sexual intercourse with a high probability the other person does not consent; rather, it is sexual intercourse with the awareness that it is *without* that person's consent, which may permissibly be inferred from all of the facts and circumstances of the case."  *Hamernick*, ¶ 26 (citations omitted).[1]  "If the instructions are

_____

[1] The instructions in this case were not identical to those in *Hamernick*.  Here, the court instructed the jury that "[a] person acts knowingly when the person is aware there exists the high probability that the person's conduct will cause a specific result."  The *Hamernick* trial court gave two "knowingly" instructions: first, that "[a] person acts knowingly with respect to the element of sexual intercourse when the person is aware of his conduct" and second, that "[a] person acts knowingly with respect to the element of without consent when the person is aware of a high probability that the sexual intercourse was without consent."  *Hamernick*, ¶ 12 (emphases removed).  Given that the court should have given an awareness-of-conduct mental state instruction (Opinion, ¶ 24), either instruction is erroneous and the difference is immaterial.

22

erroneous in some aspect, the mistake must prejudicially affect the defendant's substantial rights in order to constitute reversible error." *Deveraux*, ¶ 20.

¶41 In my view, the focus on K.R.'s intoxication and whether Pierce would have recognized her condition are misplaced. K.R. testified, consistent with what she told both the emergency-room nurse and the investigating detective, that she "came to" or "woke up" when she felt Pierce's penis "inside of [her]." She immediately told him to stop. Pierce's response was to "shove [her] face down" and say, "you asked for it." The District Court instructed the jury that consent "means words or overt actions indicating a freely given agreement to have sexual intercourse or sexual contact." The instruction added: "An expression of lack of consent through words or conduct means there is no consent or that consent has been withdrawn." Whatever K.R.'s apparent state of consciousness may have been up to that point, there is nothing ambiguous about the word "stop"—a word singularly and explicitly withdrawing any consent she might have indicated previously. And Pierce— unlike Hamernick—would have no argument that either he did not hear or he misunderstood what K.R. said to him. He responded—clearly, verbally, and forcefully— by continuing his conduct so he could "finish." *Cf. Hamernick*, ¶ 19 (discussing the evidence showing that the encounter initially was consensual and that Hamernick "immediately back[ed] off" as soon as S made clear that she "did not 'want any of this anymore.'"). The evidence also showed that Pierce's first reaction to being asked about the encounter was, "Um[,] no[,] I wasn't there" and "I [sic] been home all night." The jury had as well the evidence of K.R.'s demeanor, crying and rocking herself with her pillow.

¶42 The Opinion points to the State's closing argument referencing the improper definition of "knowingly." Opinion ¶ 16. But the prosecutor opened his closing argument by reminding the jury that "when she said stop, he continued." The prosecutor maintained that the text messages did not show consent and that Pierce "saw an opportunity." And then, "Dillon Pierce, damn the costs, full speed ahead, 'I'm going to finish.'" The prosecutor emphasized:

> And then we get Dillon's actual words. "You asked for it." You asked for it? Not "I'll stop." Not "Okay. I thought you were good with it." You asked for it. He pushes her head on the pillow and says, "You asked for it." That's the person in control.

¶43 Given the evidence that Pierce (1) shoved K.R.'s head down when she told him to stop—clearly withdrawing any consent he earlier could have perceived, (2) responded with words that just as clearly expressed his knowledge and refusal of that request, (3) kept going so he could finish, and (4) denied even being there until his sperm was found from K.R.'s medical examination, he has no reasonable argument for any likelihood of a different outcome in this case but for the faulty instruction. I would affirm.

/S/ BETH BAKER

Chief Justice Cory J. Swanson and Justice Laurie McKinnon join in the concurring and dissenting Opinion of Justice Beth Baker.

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON